COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





MICHAEL LAVELL JACKSON,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee. 

§


 


§


 


§


 


§


 


§



§

No. 08-07-00061-CR



Appeal from


 422nd District Court


of Kaufman County, Texas


(TC # 23223-422)




O P I N I O N



 Michael Lavell Jackson appeals his intoxication manslaughter (Count 1) and tampering with
evidence (Count 2) convictions. A jury found Appellant guilty of each offense. Based on
Appellant's plea of true, the jury found the enhancement allegation in each count true and assessed
punishment at imprisonment for twenty-eight years on the intoxication manslaughter conviction and
at imprisonment for twenty-five years on the tampering with evidence conviction. The trial court
entered a deadly weapon finding in the intoxication manslaughter judgment. Finding no error, we
affirm.

FACTUAL SUMMARY


 On August 9, 2004 at approximately 2:30 p.m., Charlsie Fletes was traveling 70 m.p.h. (1) on
Interstate 20 and preparing to the take the next exit when a Ford F-150 passed and then cut in front
of her to take the same exit. The truck cut Fletes short when it moved into her lane. There are
warning signs advising that the posted speed limit for the exit ramp is 30 m.p.h. The exit is initially
straight, but there is an "S" curve in the roadway before the service road is reached. Fletes slowed
down to take the exit and slowed even further upon the seeing the driver of the truck miss the "S"
curve. The truck nearly struck a light pole on the left before the driver swerved back to the right. 
He overcorrected and the truck "kind of tilted" and slammed into a deep concrete culvert. Fletes
recalled that it was a hot, sunny day and there was nothing on the roadway which made the road
slippery or caused her to lose control. 

 Fletes stopped to assist and she saw Appellant climb out of the driver's side half-door. 
Appellant appeared nervous and scared as might be expected and he was attempting to find a number
on his cell phone. He told Fletes he had exited because the woman with him needed to use the
restroom and could not wait until they got back to Dallas. Fletes looked down into the truck and saw
that the woman inside had a cut on her forehead and appeared to be unconscious. Fletes dialed 911
and remained at the scene until after the police and emergency services had arrived and she had
given her statement. 

 Robert Abundez and his wife, Vanessa Morin, were working at the Exxon gas station located
near the scene the accident. Abundez was outside painting a sign when he heard a huge noise behind
him. He told his wife to call 911 and then ran over to the culvert. The driver emerged and began
saying "my baby," referring to the woman still in the truck. Morin walked over to the accident and
saw that Appellant was limping and had blood on his leg. (2) After the police and ambulance arrived,
Abundez and Morin returned to the Exxon. While the police and emergency services were working,
Appellant entered the Exxon and asked if he could use the restroom. The men's restroom was in use
so Appellant went into the women's restroom. The police came into the Exxon looking for
Appellant and Abundez told them he was in the women's restroom. They told Appellant that he
should not have left the accident scene and made him go back outside. No one else had used the
women's restroom that day. 

 Robert Barr and his partner, Anne Atkins, are paramedics employed by East Texas Medical
Center, and they were dispatched to the accident. Barr described the damage to the truck as
extensive. Photographs show that the front end of the truck was crushed by the impact with the
concrete culvert. Once Barr determined that Appellant did not have any life threatening injuries, he
climbed down to the truck to check on the passenger, Marilyn Bridges. Bridges had an obvious
injury to the right side of her head; she was not breathing and did not have a pulse. Barr climbed
back out of the ditch and looked for Appellant but could not find him. When Appellant was located,
Barr informed him that the passenger was deceased. Appellant did not seem concerned. Barr
subsequently heard Appellant on the phone saying they were going to get Bridges out of the truck
and take her to the hospital. Barr again told Appellant that Bridges had died in the accident. While
speaking with Appellant, Barr noticed that his pupils were extremely constricted. He had Appellant
move into the back of the ambulance where it was darker. Appellant's pupils remained constricted
as they had been in the bright light. This indicated to Barr that Appellant might be under the
influence of some type of medication or illegal drug and he shared his concerns with the police
officers at the scene. 

 Anne Atkins observed that Appellant was on the telephone a lot and did not want to talk to
the paramedics or the police. They told Appellant at least twice that the passenger had died. Each
time he would acknowledge it but then he would forget and ask them again. 

 Joe Hobbs, a Terrell police officer, was one of the first officers on the accident scene. He
looked in the truck and saw that the female passenger was not breathing. He immediately began a
fatality vehicle crash and possible manslaughter investigation. Hobbs determined that Appellant had
been driving. He got Appellant's driver's license and walked over closer to the vehicle to get
information. He wanted additional information from Appellant, but Appellant had left the scene and
walked to the Exxon. Hobbs and his supervisor, Myles Hanks, walked over to the Exxon to find
Appellant and continue the investigation. Upon learning Appellant was in the restroom, Hobbs
heard Appellant talking on the telephone. He knocked on the door and asked Appellant what he was
doing. Appellant opened the door and walked past Hobbs. When Hobbs heard the toilet running,
he went inside of restroom and saw marihuana swirling around in the toilet bowl as it continued to
fill with water. The marihuana was dry and floating on top of the water. Hanks collected the
marihuana and bagged it as evidence. When Hobbs returned to the accident scene, Barr told him he
suspected that Appellant was under the influence of some kind of drug. Hobbs handcuffed Appellant
and transported him to the Medical Center in Terrell for a mandatory blood specimen to be drawn. 
Appellant's injuries were also treated at the hospital. Leslie Shortnacy drew the blood at 3:50 p.m. 
 Testing of the blood specimen showed the presence of tetrahydrocannabinol, which is the
active component of marihuana, and carboxytetrahydracannabinol, which is a metabolic breakdown
product of the parent drug. The presence of tetrahydrocannabinol indicated that marihuana had been
ingested within a six hour period before the blood was drawn. In short, Appellant had ingested
marihuana sometime between 9:50 a.m. and 2:30 p.m. when the accident occurred. 

 Scott Kepner is a Terrell police officer trained in accident investigation. He arrived at the
accident scene at 2:50 p.m. The amount of damage to Appellant's vehicle indicated that it was
traveling at a high rate of speed when it impacted the culvert. Kepner, pointing to the photographs
admitted into evidence, described the bend in the roadway as an "S" which was short but not sharp. 
He observed that Appellant drove into the grass on the left side of the roadway but overcorrected and
began sliding sideways before impacting the culvert. Kepner went to the hospital to talk to
Appellant about the accident. Appellant's behavior was unusual in that he fluctuated between
emotional and indifferent. With the information available to him, Kepner suspected that Appellant
had been using controlled substances and questioned him. Appellant admitted that he had smoked
marihuana that morning at 3 a.m. or 4 a.m. Appellant gave Kepner a voluntary written statement. 
In that statement, Appellant said that the couple decided to stop at the Exxon to use the restroom and
then go to the outlet mall. When he exited, there was an area with new pavement which was slick. 
The truck began sliding and he lost control. 

 William Kasper is employed by the Texas Department of Public Safety. Three days after the
accident, the Terrell Police Services asked him to assist in drawing the accident scene. Using
equipment to measure the roadway, Kasper examined the scene and rendered a drawing. Kasper
determined that the truck initially went off of the roadway to the left, overcorrected and began sliding
sideways before going into the culvert. He found no evidence the truck had braked before the exit
and he concluded the driver had taken the exit at an unsafe speed. 

 Appellant's investigator, Rex Reynolds, examined the exit and roadway and characterized
the exit as deceptive because it had a "little dog leg" which could cause a driver to lose control if he
was not careful or thinking about it. In his opinion, there was a greater danger if a person was
unfamiliar with the exit. He testified that an intoxicated person who was unfamiliar with the exit
could have a wreck because of the "dog leg" but added that a sober person or a person who was in
a hurry and driving too fast could also have an accident at this exit. On cross-examination, Reynolds
testified that he had worked in narcotics and knew that marihuana slowed a person's reflexes. In his
opinion, a person who was intoxicated on marihuana and took the exit at 70 m.p.h. placed himself
and his passengers in grave danger. 

 Appellant testified in his own defense. He had never driven on that stretch of I-20 before and
he was unfamiliar with the exit. Bridges told him as they reached the exit that they should stop at
the outlet mall so she could buy a gift. He recalled that he was traveling at 60 or 65 m.p.h. and since
the speed limit for the exit was 40 m.p.h., he slowed down. When he stepped on his brakes,
however, the vehicle began sliding on loose gravel in a newly patched section of roadway. He lost
control and went into the culvert. He denied smoking marihuana on the day of the accident and
denied telling the officers that he had. When the State attempted to impeach Appellant with a 1997
felony conviction for possession of cocaine, he denied having a conviction. The State utilized
fingerprint evidence to prove that Appellant had been convicted of possession of cocaine in 1997. 
 The jury rejected Appellant's defense and found him guilty of intoxication manslaughter and
tampering with evidence as alleged in the indictment. The jury also found that used a deadly
weapon, namely, a motor vehicle, during the commission of intoxication manslaughter. Based on
Appellant's plea of true, the jury found the enhancement allegation in each count true and assessed
punishment at imprisonment for twenty-eight years on the intoxication manslaughter conviction and
at imprisonment for twenty-five years on the tampering with evidence conviction. The trial court
entered a deadly weapon finding in the intoxication manslaughter judgment.

BLOOD TEST RESULTS


 In Point of Error One, Appellant contends the trial court erred in admitting the blood test
results over his objection that Leslie Shortnacy, a graduate nurse, was not qualified to draw the
blood. The State responds that Shortnacy is a "qualified technician" within the meaning of
Section 724.017 of the Transportation Code. That section provides, in pertinent part, that:

 (a) Only a physician, qualified technician, chemist, registered professional nurse, or
licensed vocational nurse may take a blood specimen at the request or order of a
peace officer under this chapter.


Tex.Transp.Code Ann. § 724.017(a)(Vernon 1999). The Transportation Code does not define
qualified technician, but subsection (c) provides that "qualified technician" does not include
emergency medical services personnel. Tex.Transp.Code Ann. § 724.017(c).

 We have not found any reported cases holding that a graduate nurse is a qualified technician
under the statute. Courts have held, however, that a phlebotomist is a qualified technician within
the meaning of Section 724.017(a) where there is evidence showing the person's qualifications to
draw a blood specimen. See Jessup v. State, No. 13-02-00024-CR, 2004 WL 2612958 (Tex.App.--Corpus Christi Nov. 10, 2004, no pet.)(not designated for publication)(the evidence showed that
phlebotomist was a qualified technician under Section 724.017(a) where the record showed that he
was employed as a phlebotomist at the hospital, his job responsibilities included drawing blood, he
had successfully completed a course in the drawing of blood and had successfully taken the
hospital's checklist test on the drawing of blood, and he was within three months of completing a
college course to become a laboratory technician); Torres v. State, 109 S.W.3d 602, 606 (Tex.App.--Fort Worth 2003, no pet.)(because no one testified regarding qualifications of person who drew
blood and record contained no evidence blood was drawn by someone hospital had determined to
be qualified, State failed to prove that person drawing blood was qualified under Section 724.017);
State v. Bingham, 921 S.W.2d 494, 496 (Tex.App.--Waco 1996, pet. ref'd)(concluding that the term
"qualified technician" includes a phlebotomist whom the hospital has determined is qualified to draw
blood and whose credentials were made part of the record). See also Cordero v. State, No.
08-05-00285-CR, 2007 WL 4724675 (Tex.App.--El Paso 2007, Jan. 17, 2007, pet. ref'd)(not
designated for publication)(phlebotomist was a qualified technician). The focus of our inquiry is
whether Shortnacy is qualified by the hospital which employed her to draw blood.

 Shortnacy had worked at the Medical Center in Terrell for nine years as a certified nursing
assistant and she had graduated from nursing school in May of 2004. She was a graduate nurse at
the time she drew Appellant's blood. As a certified nursing assistant, she had been trained to draw
blood by the hospital nursing staff and the hospital had a checklist which Shortnacy had successfully
completed in order to be allowed to draw blood. Drawing blood had been part of Shortnacy's regular
duties for approximately eight years. Her nursing school training and education included a skills lab
in which Shortnacy and the other students were trained to draw blood. Shortnacy was familiar with
the hospital's procedure for drawing blood and she followed it in this case. Because the evidence
showed that Shortnacy had been trained to draw blood and was qualified under the hospital's
procedures for drawing a blood specimen, we conclude the trial court did not abuse its discretion by
finding that she was a qualified technician under Section 724.017(a) of the Transportation Code. 
Point of Error One is overruled. 

SUFFICIENCY OF THE EVIDENCE


 In Point of Error Two, Appellant challenges the legal and factual sufficiency of the evidence
supporting his intoxication manslaughter conviction. More specifically, he argues the evidence is
insufficient to prove that he was intoxicated and that by reason of that intoxication caused the death
of Marilyn Bridges.

Standards of Review


 In addressing legal sufficiency, we review all the evidence, both State and defense, in the
light most favorable to the verdict to determine whether any rational trier of fact could have found
the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); Geesa v. State, 820 S.W.2d 154, 159
(Tex.Crim.App. 1991), overruled on other grounds, Paulson v. State, 28 S.W.3d 570
(Tex.Crim.App. 2000). We consider all of the evidence, whether admissible or inadmissible. Wilson
v. State, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999); Johnson v. State, 967 S.W.2d 410, 412
(Tex.Crim.App. 1998). We do not resolve any conflict of fact or assign credibility to the witnesses,
as it was the function of the trier of fact to do so. See Adelman v. State, 828 S.W.2d 418, 421
(Tex.Crim.App. 1992); Matson v. State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). Instead, our
duty is only to determine if both the explicit and implicit findings of the trier of fact are rational by
viewing all of the evidence admitted at trial in a light most favorable to the verdict. Adelman, 828
S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict.
Matson, 819 S.W.2d at 843. The standard of review is the same for both direct evidence and
circumstantial evidence cases. Geesa, 820 S.W.2d at 158.

 In reviewing factual sufficiency of the evidence to support a conviction, we are to view all
the evidence in a neutral light, favoring neither party. Johnson v. State, 23 S.W.3d 1, 7
(Tex.Crim.App. 2000); Clewis v. State, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In performing
our review, we are to give due deference to the fact finder's determinations. See id. at 8-9; Clewis,
922 S.W.2d at 136. The fact finder is the judge of the credibility of the witnesses and may "believe
all, some, or none of the testimony." See Chambers v. State, 805 S.W.2d 459, 461 (Tex.Crim.App.
1991). Evidence is factually insufficient if it is so weak that it would be clearly wrong and
manifestly unjust to allow the verdict to stand, or the finding of guilt is against the great weight and
preponderance of the available evidence. Johnson, 23 S.W.3d at 11. Thus, the question we must
consider in conducting a factual sufficiency review is whether a neutral review of all the evidence,
both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to
undermine confidence in the fact finder's determination, or the proof of guilt, although adequate if
taken alone, is greatly outweighed by contrary proof. See id.

 Under the first prong of Johnson, we cannot conclude that a conviction is "clearly wrong"
or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted
to acquit had we been on the jury. Watson v. State, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006).
Under the second prong of Johnson, we cannot declare that a conflict in the evidence justifies a new
trial simply because we disagree with the jury's resolution of that conflict. Id. Before finding that
evidence is factually insufficient to support a verdict under the second prong of Johnson, we must
be able to say, with some objective basis in the record, that the great weight and preponderance of
the evidence contradicts the jury's verdict. Id.

Elements of Intoxication Manslaughter


 A person commits intoxication manslaughter if the person (1) operates a motor vehicle in a
public place, (2) is intoxicated, and (3) by reason of that intoxication causes the death of another by
accident or mistake. Tex.Penal Code Ann. § 49.08 (Vernon 2003). "Intoxicated" means not
having the normal use of mental or physical faculties by reason of the introduction of alcohol, a
controlled substance, a drug, a dangerous drug, a combination of two or more of those substances,
or any other substance into the body. Tex.Penal Code Ann. § 49.01(2)(A). Count 1 of the
indictment alleged that Appellant was operating a motor vehicle in a public place while intoxicated
by reason of the introduction of a controlled substance, a drug, or a dangerous drug into his body and
by reason of that intoxication caused the death of Marilyn Bridges.

Intoxication


 Appellant alleges that the State failed to prove that he was intoxicated. He maintains that
while the State's expert witness testified that tetrahydrocannabinol was detected in his blood, she
could not state that he was impaired and there is no other evidence of impairment of his mental or
physical faculties. Appellant is correct that the blood test results only show the presence of the
active component of marihuana. The State's expert testified that, unlike alcohol, there is no way to
correlate impairment with the level of any drug detected in the blood specimen. But the State is not
limited to establishing intoxication through expert testimony. Intoxication may be established by
circumstantial evidence. See Smithhart v. State, 503 S.W.2d 283, 285 (Tex.Crim.App. 1974);
Hernandez Guerreo v. State, 773 S.W.2d 775, 776 (Tex.App.--Corpus Christi 1989, no pet.). We
begin by examining Appellant's driving. Evidence of erratic driving, a collision, failure to apply
brakes in order to avoid a collision, and fleeing the scene of the accident is indicative of impaired
judgment. See Chaloupka v. State, 20 S.W.3d 172, 175 (Tex.App.--Texarkana 2000, pet. ref'd)
(erratic driving, a collision, and fleeing scene); Frohwein v. State, No. 08-03-00488-CR, 2005 WL
1413210, *6 (Tex.App.--El Paso June 16, 2005, pet. ref'd)(not designated for publication)(erratic
driving, failure to apply brakes); Markey v. State, No. 14-02-00281-CR, 2003 WL 253299 *2
(Tex.App.--Houston [14th Dist.] February 6, 2003, no pet.)(not designated for publication)(running
a stop sign, nearly colliding with another vehicle, then landing in ditch and crashing through fence). 
Appellant made an admittedly last-second decision to take the exit, he passed another vehicle while
driving in excess of 70 m.p.h. and exited without braking until he ran off of the left side of the exit. 
Both paramedics noted that Appellant's pupils were extremely constricted which can be caused by
medication or illegal drugs. Even taking into account the physical and emotional trauma of the
accident, Appellant's behavior was unusual in that he swung from being emotional to indifferent and
the paramedics had to tell him more than once that Bridges had died. When one of the officers began
talking to Appellant and investigating the accident, Appellant walked away when the officer was not
looking and attempted to flush marihuana down the toilet. The graduate nurse who drew Appellant's
blood smelled a faint odor of marihuana on Appellant's clothes when she drew the blood. At the
hospital, Appellant admitted to the officers that he had smoked marihuana early that morning but
other evidence showed that Appellant had consumed marihuana between 9:50 a.m. and the time of
the accident. When the evidence of impaired judgment is combined with evidence of marihuana
consumption, it is legally sufficient to establish that the defendant did not have the normal use of his
mental and physical faculties due to the introduction of marihuana into his body.

 Turning to the factual sufficiency analysis, there is evidence that Appellant's speech was not
slurred and he did not have poor balance aside from his injured leg. Vanessa Morin testified that
Appellant did not seem impaired when he came into the Exxon. On the other hand, Morin seemed
to have been more focused on Appellant's injured leg as she mentioned it several times during her
testimony. At trial, Appellant denied smoking any marihuana that day but the blood test evidence
belied his testimony. And Appellant admitted to the police that he had smoked marihuana that
morning. The paramedic Barr noted that Appellant's constricted pupils could also have indicated
a head injury, but there was no evidence Appellant suffered one. Appellant testified that he slowed
down for the exit and he blamed the accident on a newly patched area of the pavement and loose
gravel. Other evidence showed that Appellant took the exit at a high rate of speed and did not apply
his brakes until he reached the "S" curve and quickly lost control. Other than Appellant's testimony,
there is no evidence that the roadway had undergone recent repairs and Fletes testified that there was
nothing on the roadway which made it slippery. Although there is conflicting evidence of
intoxication, the evidence of guilt is not greatly outweighed by the contrary evidence. We conclude
that the evidence is factually sufficient to support the jury's finding that Appellant was intoxicated
by reason of the introduction of marihuana into his body.

Causation


 Appellant also challenges the evidence supporting the jury's finding that his intoxication
caused Bridges' death. He argues that the accident could have resulted from the construction of the
exit ramp, his unfamiliarity with the road, and his unfamiliarity with the truck he was driving. He
reasons that the State failed to prove that intoxication, standing alone, caused the death. 

 Section 6.04 of the Texas Penal Code provides that:

 (a) A person is criminally responsible if the result would not have occurred but for
his conduct, operating either alone or concurrently with another cause, unless the
concurrent cause was clearly sufficient to produce the result and the conduct of the
actor was clearly insufficient.


Tex. Penal Code Ann. § 6.04(a)(Vernon 2003). The State is required to prove beyond a reasonable
doubt that Appellant's intoxication, not just his operation of a vehicle, caused the fatal result. See
Daniel v. State, 577 S.W.2d 231, 233-34 (Tex.Crim.App. [Panel Op.] 1979). The existence or
nonexistence of such a causal connection is normally a question for the jury's determination. 
Thomas v. State, 756 S.W.2d 59, 61 (Tex.App.--Texarkana 1988, pet. ref'd). 

 The "but for" causal connection in Section 6.04(a) must be established between the
defendant's conduct and the resulting harm. Hale v. State, 194 S.W.3d 39, 42 (Tex.App.--Texarkana
2006, no pet.). If concurrent causes are present, two possible combinations exist to satisfy the "but
for" requirement: (1) the defendant's conduct may be sufficient by itself to have caused the harm,
regardless of the existence of a concurrent cause; or (2) the defendant's conduct and the other cause
together may be sufficient to have caused the harm. Id. However, Section 6.04(a) further limits the
"but for" causality for concurrent causes by the last phrase, "unless the concurrent cause was clearly
sufficient to produce the result and the conduct of the actor clearly insufficient." Id., quoting
Tex.Penal Code Ann. § 6.04. If the additional cause--other than the defendant's conduct--is clearly
sufficient, by itself, to produce the result and the defendant's conduct, by itself, is clearly insufficient,
then the defendant cannot be convicted. Hale, 194 S.W.3d at 42, citing Robbins v. State, 717
S.W.2d 348, 351 (Tex.Crim.App. 1986).

 Taking the evidence in the light most favorable to the verdict, the jury could have found
beyond a reasonable doubt that Appellant's intoxication was sufficient by itself to have caused the
accident and Bridges' death. Alternatively, if the jury found that the construction of the road and
Appellant's unfamiliarity with it and the vehicle were concurrent causes along with his intoxication,
the evidence does not support a conclusion that the concurrent causes were clearly sufficient by
themselves to produce the result or that Appellant's intoxication was clearly insufficient by itself to
have caused the result. Consequently, the evidence is legally sufficient to prove the causal link
between Appellant's intoxication and Bridges' death. See Hale, 194 S.W.3d at 44 (where the
intoxicated defendant was driving at a high rate of speed and struck two vehicles which were stopped
in the middle of a two-lane road and approximately four-tenths of a mile beyond a hill, and where
the expert testimony showed that an intoxicated person has slower reflexes such that an intoxicated
person driving at a high rate of speed presents a greater danger, the evidence was sufficient to prove
that the concurrent causes, namely, the stopped car and the defendant's intoxication, were sufficient
together to cause the victim's death); Glauser v. State, 66 S.W.3d 307, 313-15 (Tex.App.--Houston
[1st Dist.] 2000, pet. ref'd)(where intoxicated defendant was traveling at a high rate of speed on a
busy highway and struck a car that was nearly stopped in the roadway and killed both the person
pushing the vehicle and the one who was steering, and other evidence showed that a person with full
command of his mental and physical faculties would have been able to apply his brakes and avoid
hitting the disabled vehicle, the court of appeals held that although the stopped car and dark night
may have been concurrent causes of the accident, the evidence was legally and factually sufficient
to prove that the defendant's intoxication also caused the death of the victims); Martinez v. State,
66 S.W.3d 467, 470 (Tex.App.--Houston [1st Dist.] 2001, pet. ref'd)(where the intoxicated
defendant was driving an eighteen wheeler above the speed limit and overturned while passing the
victims' car killing all but one of the occupants, the court of appeals found that even though the
accident may have also been caused by the eighteen wheeler's defective front-steering axle, a shifting
load, and defective brakes, the evidence was legally and factually sufficient to show that his
intoxication, combined with driving an eighteen wheeler above the legal speed limit, caused the
deaths) .

 We have also examined the evidence relevant to causation under the factual sufficiency
standard. The evidence establishing that Appellant's intoxication alone caused the accident is not
too weak to support the jury's finding on the causation element. Assuming that the jury found that
the other causes cited by Appellant were concurrent causes, the evidence does not support a
conclusion that the concurrent causes were clearly sufficient by themselves to produce the result or
that Appellant's intoxication was clearly insufficient by itself to have caused the result. Thus we
conclude that the evidence was factually sufficient to support the jury's determination that
Appellant's intoxication caused the accident and Bridges' death. We overrule Point of Error Two. 

DEADLY WEAPON FINDING


 In Point of Error Three, Appellant challenges the legal and factual sufficiency of the evidence
supporting the deadly weapon finding because no witness specifically testified that the truck was a
deadly weapon. Section 1.07 of the Texas Penal Code defines "deadly weapon" as meaning
"anything that in the manner of its use or intended use is capable of causing death or serious bodily
injury." Tex.Penal Code Ann. § 1.07(a)(17)(B)(Vernon Supp. 2008). The Court of Criminal
Appeals has recognized that anything, including a motor vehicle, which is actually used to cause the
death of a human being is a deadly weapon. Tyra v. State, 897 S.W.2d 796, 798 (Tex.Crim.App.
1995); Ex parte McKithan, 838 S.W.2d 560, 561 (Tex.Crim.App. 1992). This is necessarily so
because a thing which actually causes death is by definition, "capable of causing death." Tyra, 897
S.W.2d at 798. The State is not required to offer expert testimony to prove that an object is a deadly
weapon. Brown v. State, 716 S.W.2d 939, 946 (Tex.Crim.App. 1986); Davidson v. State, 602
S.W.2d 272, 273 (Tex.Crim.App. [Panel Op.] 1980); Denham v. State, 574 S.W.2d 129, 131
(Tex.Crim.App. 1978). 

 The evidence, taken in the light most favorable to the verdict, shows that Appellant was
operating his truck while intoxicated and at a high rate of speed when he lost control on an exit ramp
and slammed into a concrete culvert, killing his passenger even though she was wearing her seat belt
and the air bag deployed. This evidence is legally sufficient to show that the truck, in the manner
of its use, was capable of causing death. See Tyra, 897 S.W.2d at 798.

 The evidence is also factually sufficient to sustain the deadly weapon finding. Appellant
argues that it was the condition of the roadway which caused the accident rather than his operation
of the vehicle, and therefore, he did not "use" the vehicle in a deadly manner. While there is
evidence that the "S" curve may have been a concurrent cause of the accident, we cannot ignore the
evidence showing that Appellant was intoxicated and driving his truck at a high rate of speed in
excess of the speed limit when he lost control of the vehicle. We conclude that the evidence is
factually sufficient to prove that the truck, in the manner of its use, was capable of cause death. 
Point of Error Three is overruled.

TAMPERING WITH EVIDENCE


 In his fourth point of error, Appellant challenges the legal and factual sufficiency of the
evidence supporting his tampering with evidence conviction. A person commits the offense of
tampering with evidence if, knowing that an investigation or official proceeding is pending or in
progress, he alters, destroys, or conceals any record, document, or thing with intent to impair its
verity, legibility, or availability as evidence in the investigation or official proceeding. Tex.Penal
Code Ann. § 37.09 (Vernon Supp. 2008). The indictment alleged that Appellant intentionally or
knowingly destroyed or concealed evidence, to-wit: marihuana, with intent to impair its availability
as evidence in the investigation that was pending regarding the death of Marilyn Bridges. The
application paragraph of the court's charge inquired whether the evidence proved beyond a
reasonable doubt that Appellant had intentionally or knowingly destroyed or concealed evidence to-wit marihuana, with intent to impair its availability as evidence in the investigation that was pending
regarding the death of Marilyn Bridges. 

 Appellant argues that an intoxication manslaughter offense was not pending when he
attempted to flush the marihuana. He directs us to Pannell v. State, 7 S.W.3d 222 (Tex.App.--Dallas
1999, pet. ref'd) in support of his argument. There, the Dallas Court of Appeals held that the
evidence was legally insufficient to support the defendant's conviction of tampering with evidence
where the defendant threw marijuana out of his car window when the police were attempting to pull
him over for speeding. Pannell, 7 S.W.3d at 223. The court found that Section 37.09 requires the
defendant be aware that the thing he altered, destroyed, or concealed was evidence in the
investigation as it existed at the time of the alteration, destruction, or concealment. Id.

 Appellant's argument is without merit for two reasons. First, the State was not required to
prove that the officers had determined they would file criminal charges against Appellant for
intoxication manslaughter at the time he destroyed the marihuana. The indictment alleged that
Appellant destroyed the marihuana while an investigation into Marilyn Bridges' death was pending. 
Second, the instant case is distinguishable from Pannell because, contrary to Appellant's assertion,
there is evidence that the police officers had begun investigating the accident resulting in Bridges'
death at the time Appellant went to the Exxon and attempted to flush the marihuana. Officer Joe
Hobbs was one of the first officers on the accident scene and, after seeing that Bridges was not
breathing and apparently deceased, he immediately began a fatality vehicle crash and manslaughter
investigation. He determined Appellant had been driving and began obtaining information from
Appellant, including his driver's license. Appellant left the scene when Hobbs walked over to the
vehicle. The investigation into the cause of the accident remained pending at the time Appellant left
the scene. Thus, the evidence is legally sufficient to show that Appellant knew that an investigation
into the accident and Bridges' death was pending when he attempted to flush the marihuana.

 There is no evidence contradicting or impeaching Hobbs on this issue. Even Appellant, in
his own testimony, failed to address what he knew about the pending investigation or why he flushed
the marihuana down the toilet. We conclude that the evidence supporting this element is not too
weak to support the jury's finding of guilt. We overrule Point of Error Four and affirm the judgment
of the trial court.


June 3, 2009 

 ANN CRAWFORD McCLURE, Justice


Before Chew, C.J., McClure, and Carr, JJ.

Carr, J., not participating


(Do Not Publish)

1. The posted speed limit is 65 m.p.h.
2. Appellant suffered a broken foot in the accident.